UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE BOARD OF EDUCATION OF THE
HARRISON CENTRAL SCHOOL DISTRICT,

Plaintiff,

-v-

C.S. and E.L., *on behalf of their minor child,*
*M.L.*,

Defendants.

No. 23-CV-8182 (KMK)

OPINION & ORDER

---

Appearances:

Sara M. Richmond, Esq.
Ayanna Y. Thomas, Esq.
Howard M. Miller, Esq.
Bond, Schoeneck & King, PLLC
Garden City, NY; New York, NY; White Plains, NY
*Counsel for Plaintiff*

Neal H. Rosenberg, Esq.
Michael Mastrangelo, Esq.
Law Office of Neal Rosenberg
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff, the Board of Education of the Harrison Central School District ("Plaintiff" or the "District"), brings this Action against C.S. and E.L. (together, "Defendants" or the "Parents"), in their capacity as the parents of their minor child, M.L., under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. (*See* Compl. (Dkt. No. 6).) This dispute arises out of the decisions of an Impartial Hearing Officer ("IHO") and a State Review Officer ("SRO"), who adjudicated the Parents' administrative claims for relief based upon the District's alleged failure to provide M.L. a free and appropriate public education ("FAPE") for

the 2020–21 school year.  (*See generally id.*)  Before the Court is the District's Motion for

Summary Judgment (the "Motion").  (*See* Not. of Mot. (Dkt. No. 21).)  For the following

reasons, the Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule

56.1, (*see* Pl's Rule 56.1 Statement ("Pl's 56.1") (Dkt. No. 23); Defs' Response Rule 56.1

Statement ("Defs' Resp. 56.1") (Dkt. No. 28)),[1] as well as the administrative record.[2]

#### 1.  The Parties

The District is a local educational agency located within the County of Westchester, New

York.  (Pl's 56.1 ¶ 1; Defs' Resp. 56.1 ¶ 1.)  M.L. is a student who resides in the District who has

been classified by the District's Committee on Special Education ("CSE") as a student with a

disability.  (Pl's 56.1 ¶ 2; Defs' Resp. 56.1 ¶ 2.)  C.S. and E.L. are M.L.'s parents.  (Pl's 56.1 ¶ 3;

Defs' Resp. 56.1 ¶ 3.)

---

[1] Beginning after paragraph 68, the numbering of the paragraphs in the Parents' Response Rule 56.1 Statement starts over at paragraph "1" and therefore no longer matches the numbering of the District's Rule 56.1 Statement.  (*See* Defs' Resp. 56.1 14–17.)  The Court presumes that this was a mistake and as such refers to the paragraphs as if the Parents consistently numbered the paragraphs in their Response Rule 56.1 Statement.

Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper righthand corner of each page.

[2] The Office of State Review has provided the Court with the administrative record in this case.  This hard-copy record is on file with the Court.  The administrative record includes, inter alia, the SRO's decision (cited as "SRO Op."), the IHO's decision (cited as "IHO Op."), the Impartial Hearing Transcript (cited as "Hearing Tr."), the District's Exhibits from the Impartial Hearing (cited as "Dist. Exs."), and the Parents' Exhibits from the Impartial Hearing (cited as "Parents' Exs.").  With respect to each of these categories of documents, the Court cites to the page numbers reflected on the stamps provided by the Office of State Review on the upper and lower righthand corners of each page.

2.  The Student's Educational and Medical History

It is undisputed that M.L. and the Parents' three older children have never attended public school—as students within the District or anywhere else.  (Pl's 56.1 ¶¶ 5, 27; Defs' Resp. 56.1 ¶¶ 5, 27.)

For kindergarten and first grade, M.L. attended a private school, "the German School," in White Plains, New York.  (Pl's 56.1 ¶ 6; Defs' Resp. 56.1 ¶ 6.)  During M.L's first grade year, the Parents began receiving "feedback from the teachers [at the German School] that [he had] some issues and challenges . . . [when it came to] keeping up with the class and also outside of class."  (Hearing Tr. 462:24–463:3; *see also id.* at 463:10–15 ("Academically and socially we were becoming aware of [M.L.'s challenges in school] . . . around first grade[,] which is when we really started to . . . get more professional assistance and start checking into it.").)  Based on an evaluation by a private psychologist—Dr. Gottesfeld—M.L received that year, he was diagnosed with a "Learning-based Language Disorder, Attention Deficit Hyperactivity Disorder Unspecified, Dyslexia, Disorder of Written Expression, Mixed Receptive and Expressive Language Disorder, and Dysgraphia."  (Dist. Exs. 47; *see also id.* at 84.)[3]  Thus, when M.L. began second grade in 2016, the Parents enrolled him at The Eagle Hill School ("Eagle Hill"), a private school in Greenwich, Connecticut.  (*See* Pl's 56.1 ¶ 7; Defs' Resp. 56.1 ¶ 7.)[4]

---

[3] As of 2020, M.L.'s mother felt he was "no longer dyslexic."  (Dist. Exs. 84.)

[4] Although the Parties agree that Eagle Hill has not been approved by the New York State Education Department for contracting with New York public school districts, (*see* Pl's 56.1 ¶ 10; Defs' Resp. 56.1 ¶ 10), that fact is not fatal to the Parents' underlying request for tuition reimbursement, *see Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 4 (1993) (disagreeing with the theory that "a parent may not obtain reimbursement for a unilateral placement if that placement was in a school that was not on [a state's] approved list of private schools" and noting that "[p]arents' failure to select a program known to be approved by [a state] in favor of an unapproved option is not itself a bar to reimbursement").

Beginning in 2018, the District had M.L. undergo a series of evaluations, which, as relevant here, included separate educational, occupational therapy, speech and language, and psychological evaluations. (Pl's 56.1 ¶ 12; Defs' Resp. 56.1 ¶ 12; *see also* Dist. Exs. 26–57.) With respect to the educational evaluation, M.L. was given the "Kaufman Test of Educational Achievement (KTEA-3), Third Edition, Form A" on October 5, 2018. (Pl's 56.1 ¶ 13; Defs' Resp. 56.1 ¶ 13; *see also* Dist. Exs. 26–35.) Based on that evaluation, M.L. was found to be performing in the above-average range in spelling; in the average range with respect to letter and word recognition, math concepts and applications, math computation, and written expression; and in the below-average range in reading comprehension. (*See* Dist. Exs. 27–28.)

On October 29, 2018, M.L. was evaluated by an occupational therapist. (*See id.* at 36–38.) Among other things, the occupational therapist noted that M.L.'s: "profile [was] not significant for sensory processing deficits[,]" but that he "did appear internally distracted" during the evaluation"; "exhibit[ed] below grade level near point copying skills, but [] produced a writing sample that was fairly legible and somewhat organized"; and "demonstrated [v]isual motor skills . . . just in the below average range[, with n]on-[m]otor [v]isual [p]erceptual skills and [m]otor [c]oordination skills [] in the average range." (*Id.* at 38.)

As to the speech and language evaluation, M.L. completed a battery of tests administered by a speech pathologist on November 30, 2018. (*See id.* at 39–46.) These tests revealed that M.L. had strengths in recalling sentences, following directions, formulating sentences, and understanding semantic relationships, but that he had weaknesses with receptive language and auditory processing skills. (Pl's 56.1 ¶ 19; Defs' Resp. 56.1 ¶ 19.) In addition, the speech pathologist found that M.L. was able to understand information when it was broken down into

shorter pieces, but that, as the information or auditory load became longer, he struggled.  (Pl's 56.1 ¶ 20; Defs' Resp. 56.1 ¶ 20.)[5]

Finally, on February 27, 2019, M.L. was given a psychological evaluation.  (Dist. Exs. 49–52.)  The testing that was administered demonstrated that M.L. was in the average range for his verbal comprehension, fluid reasoning, working memory, processing speed, and full scale indices, and that he was in the low-average range for his visual spatial index.  (*Id.* at 51.)  However, the examining psychologist noted that M.L. had difficulties with visual attention, sustaining attention, and his stamina during his testing.  (*Id.* at 52.)  The psychological evaluation also noted that M.L.'s mother and teacher completed certain rating scales.  (*Id.* at 51.)  Based on those scales, M.L.'s mother indicated that his peer relations index fell in the very-elevated range and that his inattention index fell in the elevated range.  (*Id.* at 52.)  M.L.'s teacher indicated that his peer relation, defiance/aggression, and inattention indices all fell in the very-elevated range.  (*Id.* ("Difficulties with social skills were consistent and reported both at school and home.").)

### 3.  M.L.'s Individualized Education Program for the 2020–21 School Year

On January 7, 2020, M.L.'s mother, C.S., signed a District form titled Resident Student Parentally Placed in Non-Public Schools Outside of District Planning for the 2020–21 School Year.  (*See* Dist. Exs. 75.)  At the top of the form, C.S. wrote, "[w]e have not decided on a program for the 2020–21 school year, we would like to consider the District's recommendation before making a determination[.]"  (*Id.*)  Under the heading "Request for FAPE," she signed the line indicating that she "d[id] not intend to place [M.L.] in a nonpublic school for the upcoming

---

[5] During the Impartial Hearing, discussed *infra*, the speech pathologist explained that the results of the speech and language testing were only a minimal estimate of M.L.s abilities due to the impact of M.L.'s inattention during the testing on those results.  (Pl's 56.1 ¶ 21; Defs' Resp. 56.1 ¶ 21.)

school year[,]" though she added the following caveat: "Contingent on an appropriate program recommendation." (*Id.*)  Notably, however, she did not sign the line stating, "I am considering [placing] or have already decided to place my child in a nonpublic school for the upcoming school year.  However, I am still requesting that the [District] make a [FAPE] available to my child during such school year." (*Id.*)

Later in January 2020, the Parents separately signed a re-enrollment contract with Eagle Hill for the 2020–21 school year.  (*See* Parents' Exs. 4–6 (reflecting that C.S. signed the contract on January 22, 2020, and that his father, E.L., signed the contract on January 24, 2020).)  The contract noted that the tuition for the 2020–21 school year would be $70,110.00, and that the Parents had paid a 10%, or $7,011.00, deposit.  (*Id.* at 4.)  Under the terms of the contract, the Parents agreed "to enroll [M.L.] at Eagle Hill [] for the academic year 2020–2021[,]" though there was also language indicating that the Parents could cancel M.L.'s enrollment prior to June 1, 2020 with the only penalty being the loss of the $7,011.00 deposit.  (*Id.* at 5–6.)

On May 1, 2020, the CSE convened virtually to conduct an annual review of M.L.'s progress and to develop an individualized education program ("IEP") for M.L. for the 2020–21 school year.[6]  (Pl's 56.1 ¶ 24; Defs' Resp. 56.1 ¶ 24; *see also* Dist. Exs. 78.)[7]  Attendees included

---

[6] Although the Parties appear to agree that the relevant CSE meeting took place on May *12*, 2020, (*see* Pl's 56.1 ¶ 24; Defs' Resp. 56.1 ¶ 24), the relevant documentation states that the meeting took place on May *1*, 2020, (*see* Dist. Exs. 78).  For the avoidance of any confusion, the Court will use the May 1, 2020 date herein.

[7] As discussed in greater detail *infra*, under the IDEA, "[s]chool districts, through a CSE, are responsible for formulating a written IEP for every qualifying child."  *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 102 (2d Cir. 2016) (footnote omitted).

The Court notes that the District also prepared an IEP for M.L. for the 2019–20 school year, among others, the adequacy of which is not at issue in this Action.  (*See* Dist. Exs. 2–16 (referring to the CSE as the "Subcommittee on Special Education"); *see also* Pl's 56.1 ¶ 26 (asserting that the District "had consistently maintained IEPs for M.L.; conducted required evaluations; and held IEP annual reviews" and that "the Parents have always rejected the

CSE Chairperson Julie Snider, school psychologist Judy Goodman, District special education teacher Jan Bailey, speech/language therapist Joann Raguso, Eagle Hill representatives Liza Jarombek and Chris Sweeney, and the Parents.  (Pl's 56.1 ¶¶ 28–29; Defs' Resp. 56.1 ¶¶ 28–29; *see also* Dist. Exs. 78–79 (providing a summary of the May 1, 2020 meeting).)  During the meeting, the representatives from Eagle Hill reported on M.L.'s progress during the 2019–20 school year and updated the CSE on his academic performance, social development, and various needs.  (Dist. Exs. 78.)  Additionally, the Eagle Hill representatives and the Parents provided feedback concerning IEP goals, program modifications, and testing modifications.  (*Id.* at 79 ("There was agreement with all that was discussed and recommended.").)  Given that math was M.L.'s "stronger subject," there was some discussion about having M.L. enter an integrated co-teaching ("ICT") environment for that subject.  (*Id.*)  Under an ICT model, a general education teacher and a special education teacher provide instruction and address the specific needs of the special education students in the classroom, along with the support of a special education teacher aide.  (Pl's 56.1 ¶ 41; Defs' Resp. 56.1 ¶ 41.)  This idea was ultimately rejected, however, because M.L. was to be starting middle school, where the math curriculum was accelerated, and the District wanted him to focus on successfully transitioning into a new environment.  (*See* Dist. Exs. 79; Hearing Tr. 72:5–16.)

Following the CSE meeting, the District created an IEP for M.L.  (*See* Dist. Exs. 80–91.) M.L.'s "Disability Classification" was "Other Health Impairment."  (*Id.* at 80.)  Given that he was accustomed to small classes at Eagle Hill—and to address his speech and language needs— the CSE recommended the District's Small Group Instruction ("SGI") program, which is

---

District's recommended programs and unilaterally placed M.L. at various private schools"); Defs' Resp. 56.1 ¶ 26 (admitting same).)

language-based, to support M.L.'s individualized needs for most content areas.  (Pl's 56.1 ¶ 32; Defs' Resp. 56.1 ¶ 32.)  The SGI program consisted of special classes for English/language arts ("ELA"), reading, math, and social studies, with a 12:1:1 ratio with the same dedicated special education teacher in all three special classes, as well as a special education teacher aide to support instruction and to implement the accommodations reflected in M.L.'s IEP.  (Pl's 56.1 ¶¶ 33, 35; Defs' Resp. 56.1 ¶¶ 33, 35; *see also* Dist. Exs. 87–88.)[8]  Notably, the special reading class was to be taught by a special education teacher with extensive training in various reading programs who tailors the instruction based on students' needs.  (Pl's 56.1 ¶ 36; Defs' Resp. 56.1 ¶ 36.)  The CSE also recommended a special class in academic skills, with a 12:1, i.e., twelve students to one special education teacher, ratio.  (*See* Dist. Exs. 88.)  With respect to science, the CSE recommended an ICT model for M.L.  (*See id.*)[9]  The special education teacher in the science class was the same special education teacher that would be providing support to M.L. in his special classes.  (Pl's 56.1 ¶ 42; Defs' Resp. 56.1 ¶ 42.)

---

[8] In the unique vernacular of elementary and secondary education, a ratio of "12:1:1" means twelve students, one teacher, and one paraprofessional per class.  *See E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 544 n.4 (S.D.N.Y. Feb. 16, 2016) ("The ratio's format expressed in three numbers indicates students:teachers:paraprofessionals.").

[9] The District asserts that the CSE recommended an ICT model for M.L.'s science class because it was "a relative area of strength" for him, but the Parents dispute that assertion.  (Pl's 56.1 ¶ 39; Defs' Resp. 56.1 ¶ 39.)  The record, however, is not entirely clear on that point.  Specifically, the District's evidence states that, as of the 2019–20 school year, *math* was M.L.'s "stronger subject."  (Dist. Exs. 79; *see also* Hearing Tr. 72:17–19 (testimony of the District's Interim Director of Special Education Support Services affirming that math was M.L.'s "area of strength")).  As to science, the District offered testimony at the Impartial Hearing that the CSE recommended an ICT model because "much of [science instruction] is hands on" and they "knew that [M.L.] was a hands on learner . . . , he did very well with that."  (Hearing Tr. 38:16–39:17.)  In any event, the Court need not resolve this area of disagreement between the Parties to decide the instant Motion.

Beyond the foregoing, the IEP included other support services for M.L., including small group speech and language therapy, individual counseling, and small group social skills counseling.  (Dist. Exs. 88)  The small group speech and language therapy comprised of "push-in" and "pull-out" services to support M.L.'s speech and language needs inside and outside of the classroom.  (Pl's 56.1 ¶ 44; Defs' Resp. 56.1 ¶ 44.)  Pursuant to this model, a speech and language therapist would have pushed-in to classes where M.L. would need more classroom support, such as social studies or ELA, two times in a six-day cycle for thirty-nine minutes, in light of the increased language demands in these subject areas.  (Pl's 56.1 ¶ 45; Defs' Resp. 56.1 ¶ 45.)  The speech and language therapist would have also provided pull-out services, one time in a six-day cycle for thirty-nine minutes, in the therapist's room to address M.L.'s deficit areas in speech and language.  (Pl's 56.1 ¶ 46; Defs' Resp. 56.1 ¶ 46.)[10]

In terms of the counseling services set forth in the IEP, the CSE recommended individual counseling, one time in a six-day cycle for thirty-nine minutes, and small group social skills counseling, one time in a six-day cycle for thirty-nine minutes, to provide M.L. support in connection with his social and pragmatic skills.  (Pl's 56.1 ¶ 48; Defs' Resp. 56.1 ¶ 48.)  All counseling was to be provided by a school psychologist.  (Pl's 56.1 ¶ 49; Defs' Resp. 56.1 ¶ 49.)

Based on his individualized needs, as well as input from Eagle Hill and the Parents, the CSE also recommended a set of fourteen measurable annual goals for M.L.  (Pl's 56.1 ¶ 50; Defs' Resp. 56.1 ¶ 50; *see also* Dist. Exs. 86–87.)  These goals addressed M.L.'s study skills;

---

[10] In addition to direct speech and language therapy, the CSE recommended monthly speech and language consultation services for any of M.L.'s teachers and providers, where those individuals could consult with the speech and language therapist about his needs.  (Pl's 56.1 ¶ 47; Defs' Resp. 56.1 ¶ 47.)

progress in reading, writing, math, and speech/language; and social, emotional, and behavioral progress.  (*See* Dist. Exs. 86–87.)

The IEP also contained seventeen program modifications ranging from offering M.L. special seating arrangements and movement breaks, to giving him access to a word processor for written responses and graph paper for math.  (*See id.* at 88–89.)  Finally, the CSE recommended various testing accommodations for M.L., including pacing/refocusing/redirection support, extended time, and the provision of breaks.  (*See id.* at 90.)[11]

The Parents ultimately decided to proceed with enrolling M.L. at Eagle Hill for the 2020–21 school year.  (*See* Due Process Compl. ¶ 21.)[12]

### 4.  The Parents' Due Process Complaint

Well after the 2020–21 school year relevant to this Action ended, the Parents' filed a Due Process Complaint dated April 28, 2022 with the New York State Education Department.  (*See generally id.*)  The Parents requested an impartial hearing pursuant to the IDEA and New York state law, alleging that the District was required to reimburse the Parents for M.L.'s 2020–21 school year tuition because (1) "the [IEP] offered by the District for [that year was] substantively

---

[11] The District contends that "[a]t no time during the CSE meeting did the Parents voice any objection to any aspect of the IEP."  (Pl's 56.1 ¶ 71.)  The Parents object to that contention because "the record does not support that statement."  (Defs' Resp. 56.1 ¶ 71.)  In support of its position, the District relies on the brief meeting summary attached to the CSE's IEP, which does not reflect any specific objections to the CSE's recommendations from the Parents.  (Dist. Exs. 78–79.)  The Court also notes that, to the extent they sought to controvert the District's contention, the Parents—as non-movants—were "required to do so with *specific citation* to admissible evidence."  *L.S. v. Union Free Sch. Dist. of the Tarrytowns*, No. 22-CV-10835, 2024 WL 1859970, at *1 (S.D.N.Y. Apr. 29, 2024) (emphasis added) (citation omitted).

[12] The Parents' Due Process Complaint was provided by the Office of State Review with the administrative record as a "Supplemental Document," and is on file with the Court.

and procedurally inadequate and inappropriate[,]" (2) M.L.'s placement in private school was "appropriate[,]" and (3) "equitable considerations support[ed] the Parents' claims."  (*Id.* ¶ 1.)

With respect to the IEP, the Parents asserted, among other things, that it "fail[ed] to accurately reflect the results of the evaluations available to the CSE at the time of the meeting" and that it "fail[ed] to address [M.L.'s] need for small instructional classes throughout the school day, individualized attention, specialized teaching strategies, and multisensory techniques."  (*Id.* ¶¶ 11–12.)  The Parents also averred that a 12:1:1 student-teacher ratio was not appropriate for M.L. because he was accustomed to a much smaller (4:1 to 9:1) ratio and, for classes like reading and English, the program was "too large" and M.L. "would not be placed with peers at his functional level."  (*Id.* ¶¶ 13–14.)  In addition, the Parents argued that the math curriculum reflected in the IEP "would not enable [M.L.] to meet challenging objectives in light of his relative strengths" in that subject, and—as to science—they contended that an ICT environment was "not appropriate as [his] attentional, executive functioning[,] and language challenges make it extremely difficult for him to function in a general education class."  (*Id.* ¶¶ 16–17.)

Turning to M.L.'s placement at Eagle Hill, the Parents argued that that placement was appropriate because that school was able to provide him a "supportive, structured[,] and remedial educational environment" and "instruction . . . tailored to meet his individualized needs."  (*Id.* ¶¶ 25–26.; *see also id.* ¶ 26 ("While [M.L.] requires a significant amount of redirection to maintain his focus, his teachers at Eagle Hill have been able to implement effective management needs to increase his attention and minimize distractions.  Additionally, Eagle Hill has provided the necessary social skills and emotional support to enable [M.L.] to make social/emotional progress.").)  Finally, the Parents asserted that "equitable considerations support[ed their] claims for the 2020–2021 school year as they repeatedly gave the District an opportunity to provide

[M.L. a] FAPE[,] and provided proper notice of their disagreement with the District's program. (*Id.* ¶ 24.)

### 5.  The IHO Decision

The IHO held a pre-hearing conference in connection with the administrative proceeding underlying this case on June 9, 2022.  (IHO Op. 5.)  The Impartial Hearing commenced on September 21, 2022 and concluded on October 20, 2022 after four days of proceedings.  (*Id.* at 6.)  In a decision signed on February 24, 2023, the IHO determined that the District had failed to offer the Student a FAPE for the 2020–21 school year, but that the Parents had themselves failed to demonstrate that Eagle Hill was an appropriate placement for M.L.  (*Id.* at 15–23.)

In his Decision, the IHO first considered whether the District provided M.L. a FAPE for the 2020–21 school year, and concluded that it did not.  (*See id.* at 15–19.)  The IHO provided two reasons for his conclusion.  First, the IHO explained his "great concern" about M.L.'s recommended placement in an ICT class for science given that M.L. was accustomed to smaller class sizes and that such a class would present "the real possibility of [M.L.] having negative interaction[s] with other—and unfamiliar—students" given his very elevated psychological evaluation scores relating to hyperactivity/impulsivity, defiance/aggression, and peer relations. (*Id.* at 18.)  Second, he noted that the CSE apparently failed to comply with applicable state regulations requiring that general education teachers be included in CSEs whenever a "student is or may be participating in [a] regular classroom environment[,]" because—again—the IEP recommended an ICT model for M.L.'s science class, but there was no general education teacher involved at the May 1, 2020 meeting.  (*See id.* (quoting 8 N.Y.C.R.R. § 200.3(c)(2)(ii)).)

Next, the IHO determined that the Parents failed to meet their burden to show that Eagle Hill was an appropriate placement for M.L.  (*See id.* at 19–23.)  In doing so, the IHO first noted

that M.L.'s father, E.L., had testified that M.L.'s principal need related to "his social and emotional development." (*Id.* at 20.) However, because E.L. only offered "generalized statements with little basis, other than what he had been told by" Eagle Hill regarding what the school was doing for M.L.'s social and emotional needs, the IHO gave "little weight" to E.L.'s testimony. (*Id.*)

With regard to testimony offered by a private psychologist retained in September 2021, the IHO determined that such testimony was irrelevant because all of the psychologist's findings were rendered after the school year at issue. (*See id.*) The IHO also suggested that the fact that the Parents retained a psychologist after M.L.'s sixth-grade year at Eagle Hill undercut their assertion that Eagle Hill was appropriate for M.L., at least with respect to the school's ability to meet M.L.'s social and emotional needs. (*See id.* at 20–21 ("While [none of the private psychologist's findings] are relevant to the [IEP] offered by the District or the programs [M.L.] received at Eagle Hill, as all such findings came after the conclusion of the 2020–2021 school year, I find that such speaks volumes about [E.L.'s] estimation of the sufficiency of services being provided—or not—by Eagle Hill[,] as, within months of the conclusion of [that school year, the] Parents sou[ght] and obtained weekly therapy sessions to address what [had been] the [Parents'] prime concern.").)

As to the testimony provided by Eagle Hill's Director of Placement, the IHO found that her testimony did not establish the appropriateness of M.L.'s placement at the school because she was not involved with him in any way during the relevant school year and had never spoken to any of his teachers regarding the services he received. (*Id.* at 21.) The IHO also noted that her testimony was only based upon her review of biannual reports regarding M.L.'s performance at Eagle Hill, which she had reviewed for the first time the morning she testified at the Impartial

Hearing. (*Id.*) With respect to the biannual reports from Eagle Hill themselves, the IHO found that they "provide[d] little in the way of information regarding [M.L.'s] benefit from [Eagle Hill's] program, especially as any statements were based on simple informal assessments by the very teacher[s] whose responsibility it was to provide an appropriate education [to M.L.,] such that self-interest would probably interfere with a true assessment." (*Id.* at 22.)

Finally, the IHO observed that, although the IDEA "mandates that to the maximum extent possible, disabled students are to be educat[ed] with non-disabled students[,]" no non-disabled students attend Eagle Hill. (*Id.* at 22–23.)[13]

## 6. The SRO Decision

The Parent's appealed the IHO Decision to the SRO, and the District cross-appealed on the issue of whether it had provided M.L. a FAPE. (Pl's 56.1 ¶ 76; Defs' Resp. 56.1 ¶ 76.)

In a Decision dated June 15, 2023, the SRO first considered which issues were properly before him. (SRO Op. 9–11.) In connection with the District's assertion that the IHO erroneously determined that it failed to provide M.L. a FAPE for the 2020–21 school year, the SRO concluded that the District had abandoned that argument because its Answer and Cross-Appeal only contained "a conclusory allegation that the IHO erred in finding that the [D]istrict failed to offer [M.L.] a FAPE," rather than "clearly specify[ing] the reasons for challenging the IHO's decision, [and] identify[ing] the findings, conclusions, and orders to which exceptions [were] taken," as is required under the relevant regulatory scheme in New York. (*Id.* at 9–10 (alteration adopted) (quoting 8 N.Y.C.R.R. § 279.4(a)).)

---

[13] Because he found that the Parents had not established that Eagle Hill was an appropriate placement for M.L., the IHO did not reach the question of whether equitable considerations favored the Parents such that they were entitled to tuition reimbursement. (*See* IHO Op. 23.)

Next, the SRO addressed the Parents appeal, which concerned "whether [they had] met their burden to establish that Eagle Hill was an appropriate unilateral placement for [M.L.]" (*Id.* at 11–22.)  In conducting that inquiry, the SRO began by reviewing M.L.'s educational, social, and emotional needs, including the results of the various evaluations he underwent in late 2018 and early 2019.  (*See id.* at 12–14.)  *See also supra* Section I.A.2.  Additionally, the SRO reviewed certain, more-recent evaluations concerning M.L., specifically—(1) an April 2019 letter from a speech-language pathologist at Dramatic Pragmatics Speech and Language Center, which noted, among other things, that M.L. had made "gains in his self-awareness and cognitive flexibility, improved greatly in his ability to be reciprocal in his conversation, and was inherently socially motivated and incredibly empathetic," but also that he had difficulties "with his executive function skills and presented with significant weakness in task initiation, attentional regulation, sequencing, and central coherence" such that he "benefitted greatly from highly structured learning environments"; and (2) M.L.'s December 2019 Eagle Hill Report, which indicated that M.L. "benefitted from visuals, frequent teacher cueing with structured expectations, prompts and support to stay on task, multiple opportunities to practice skills in isolation, repetition, the use of multiple reading strategies, extra and individualized attention in initiating work, a highly structured and predictable class, class discussions and guidance in using a prewriting tool for written work, and assistance in refraining from socializing with peers in class."  (*Id.* at 15.)  The SRO then reviewed the record evidence concerning Eagle Hill's educational program for M.L., explaining how that program met M.L.'s needs and the areas where M.L. demonstrated progress.  (*See id.* at 16–22.)[14]  Ultimately—after rejecting the

---

[14] The Court discusses the SRO's analysis regarding the appropriateness M.L.'s placement at Eagle Hill in greater detail below.  *See infra* Section II.C.2.

reasoning in the IHO's decision, *see supra* Section I.A.5—the SRO concluded that the Parents'
evidence established that Eagle Hill was an appropriate placement for M.L., (*see id.* at 22
("Overall, the hearing record demonstrates that Eagle Hill identified [M.L.'s] special education
needs and provided [him] with a program for the 2020-21 school year that was reasonably
calculated to enable [him] to receive educational benefits.")).

Finally, the SRO considered whether equitable considerations counseled in favor of
granting the Parents' requested tuition reimbursement.  (*See id.* at 23–25.)  The SRO first noted
that the record evidence demonstrated that the Parents attended the May 1, 2020 CSE meeting,
that there was no indication that they "impeded the [D]istrict's ability to meet its obligations
under the IDEA[,]" and that the Parents visited the middle school M.L. would have attended for
the 2020–21 school year.  (*Id.* at 24.)  The SRO also rejected the District's argument that the
Parents never intended to send M.L. to public school, given that they had signed an enrollment
contract with Eagle Hill and paid a deposit to that school before the May 1, 2020 CSE meeting.
(*See id.*)  The SRO determined that, although that "chronology of events [was] correct, . . . even
if the [P]arents had no intention of placing [M.L.] in the [D]istrict's recommended program, it is
well-settled that it would not be a basis to deny their request for tuition reimbursement."  (*Id.*)
Notwithstanding that determination, the SRO noted that the Parents had failed "to submit to the
[D]istrict 10-business-day notice of the unilateral placement at Eagle Hill[,]" which deprived the
District of the opportunity to address issues with M.L.'s IEP.  (*Id.* at 24–25 & n.15.)  Further, the
SRO explained that "the evidence in the hearing record [] fails to demonstrate that the [P]arents
informed the [D]istrict during the most recent CSE meeting of [M.L.'s] placement at Eagle Hill
prior to [his] placement there for the 2020-21 school year."  (*Id.* at 25.)  Thus, the SRO found
that the equitable considerations in this case did not weigh in favor of full tuition reimbursement;

instead, he determined that the Parents were entitled to recoup the tuition they paid to Eagle Hill for the 2020–21 school year, less 10%—i.e., $63,099.00 total.  (*See id.* at 25–26.)

    B.  Procedural History

The District filed the operative Complaint—asserting that "the SRO Decision . . . that the unilateral placement of M.L. by the Parents was appropriate and that equitable considerations supported an award of tuition reimbursement, should be reversed"—on September 18, 2023. (*See* Compl. ¶ 2.)[15]  The Parents filed an Answer on October 10, 2023.  (*See* Answer (Dkt. No. 13).)  Following an initial conference held before the Court, (*see* Dkt. (minute entry of Oct. 19, 2023)), the Parties submitted a proposed briefing schedule for the instant Motion on October 23, 2023, which the Court adopted that same day, (*see* Dkt. Nos. 17–18).

Following a request for an extension to its filing deadline, which the Court granted, (*see* Dkt. Nos. 19–20), the District filed its Motion and supporting papers on February 8, 2024.  (*See* Not. of Mot.; Pl's Mem. of Law in Supp. of Mot. for Summ. J. ("Pl's Mem.") (Dkt. No. 22); Pl's 56.1; Decl. of Sara M. Richmond, Esq. (Dkt. No. 24).)[16]  Thereafter, the Parties requested—and the Court granted—extensions of time to the applicable Opposition and Reply deadlines.  (*See* Dkt. Nos. 25–26.)  On April 5, 2024, the Parents filed their Opposition and supporting papers. (*See* Defs' Mem. of Law in Opp'n to Mot. for Summ. J. ("Defs' Opp'n") (Dkt. No. 27); Defs' Resp. 56.1.)  The District filed its Reply on May 10, 2024.  (*See*  Pl's Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Pl's Reply") (Dkt. No. 29).)

---

[15] The District initially filed a complaint on September 15, 2023, but that pleading was flagged as deficient by the Clerk of Court.  (*See generally* Dkt.)

[16] The Court notes that the District's opening memorandum of law exceeded—without permission—the limit of twenty-five pages set forth in the Court's Individual Rules.  *See* Individual Rules of Practice of the Honorable Kenneth M. Karas § II.B.  (*See also* Pl's Mem. (totaling around twenty-eight pages in length).)

II.  Discussion

A.  Statutory Background

The IDEA requires that states receiving federal funds provide a "free appropriate public education"—that is, a FAPE—to "all children with disabilities."  20 U.S.C. § 1412(a)(1)(A); *accord Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017). A FAPE "includes both 'special education' and 'related services,'" which a state must provide to a disabled child "in conformity with the child's [IEP.]"  *Endrew F.*, 580 U.S. at 390–91 (alteration adopted) (quoting 20 U.S.C. § 1401(9)(D)); *see also L.S.*, 2024 WL 1859970, at *12 ("The IDEA requires States receiving federal funds to provide all children with disabilities with a FAPE, which includes special education and related services tailored to meet the unique needs of a particular child." (quotation marks omitted) (quoting *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 741 (2d Cir. 2018))).  "School districts, through a CSE, are responsible for formulating a written IEP for every qualifying child."  *L.O.*, 822 F.3d at 102 (footnote omitted); *see also* 20 U.S.C. § 1414(d) (same).[17]  "The IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *L.O.*, 822 F.3d at 102–03 (quotation marks omitted); *see also Endrew F.*, 580 U.S. at 390–91 (listing statutory criteria governing IEPs).

"The IDEA . . . requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 580 U.S. at 403;

---

[17] "In New York, the state has assigned responsibility for developing IEPs to local CSEs. CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others."  *L.O.*, 822 F.3d at 102 n.4 (alteration, citations, and quotation marks omitted); *see also* N.Y. Educ. Law § 4402(1)(b)(1)(a).

*see also Mr. P*, 885 F.3d at 757 ("Prior decisions of this Court are consistent with the Supreme

Court's decision in *Endrew F.*"); *L.O.*, 822 F.3d at 103 ("To comply with the provisions of the

IDEA, the IEP must be reasonably calculated to enable the child to receive educational benefits."

(quotation marks omitted)).  There is no "bright-line rule" determining "what 'appropriate'

progress" means; rather, "[t]he adequacy of a given IEP turns on the unique circumstances of the

child for whom it was created."  *Endrew F.*, 580 U.S. at 404; *see also S.C. v. Katonah-Lewisboro*

*Cent. Sch. Dist.*, 175 F. Supp. 3d 237, 250 (S.D.N.Y. 2016) ("The IDEA does not itself articulate

any specific level of educational benefits that must be provided through an IEP." (quotation

marks omitted)), *aff'd sub nom. J.C. v. Katonah-Lewisboro Sch. Dist.*, 690 F. App'x 53 (2d Cir.

2017) (summary order).  The Supreme Court has explained that "[f]or children receiving

instruction in the regular classroom, this would generally require an IEP reasonably calculated to

enable the child to achieve passing marks and advance from grade to grade."  *Endrew F.*, 580

U.S. at 394 (quotation marks omitted).  But, for "a child who is not fully integrated in the regular

classroom and not able to achieve on grade level . . . his [or her] IEP . . . must be appropriately

ambitious in light of his [or her] circumstances."  *Id.* at 402.  In other words, an IEP "providing

merely more than de minimis progress from year to year" is insufficient, *id.* at 402–03 (italics

and quotation marks omitted), but, it also need not "furnish[] . . . every special service necessary

to maximize each handicapped child's potential," *Bd. of Educ. of Hendrick Hudson Cent. Sch.*

*Dist. v. Rowley*, 458 U.S. 176, 199 (1982), or "provide[] everything that might be thought

desirable by loving parents," *S.C.*, 175 F. Supp. 3d at 250; *see also L.S.*, 2024 WL 1859970, at

*12 (same).

Moreover, "[b]ecause the law expresses a strong preference for children with disabilities

to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers,

special education and related services must be provided in the least restrictive setting consistent with a child's needs," and "[o]nly 'when the nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting 20 U.S.C. § 1412(5); *id.* § 1401(a)); *Avaras ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 18-CV-6964, 2019 WL 4600870, at *2 (S.D.N.Y. Sept. 21, 2019) ("In addition to providing an education that is likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment[.]" (citing 20 U.S.C. § 1412(a)(5)(A))).

"[The] IDEA also provides a variety of procedural safeguards with respect to the provision of [a FAPE] by school districts." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 81–82 (2d Cir. 2005) (quotation marks omitted); *accord B.M. v. Pleasantville Union Free Sch. Dist.*, No. 20-CV-2192, 2021 WL 4392281, at *10 (S.D.N.Y. Sept. 24, 2021); *see also* 20 U.S.C. § 1415 (listing safeguards). "[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley*, 458 U.S. at 206. On the other hand, however, not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA," *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009), although "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not," *R.E.*, 694 F.3d at 190. Specifically, a procedural violation violates the IDEA only if it

([i]) impeded the child's right to a free appropriate public education;

([ii]) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or

([iii]) caused a deprivation of educational benefits.

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525–26 (2007) (citation and quotation marks omitted); *see also Y.N. v. Bd. of Educ. of Harrison Cent. Sch. Dist.*, No. 17-CV-4356, 2018 WL 4609117, at *14 (S.D.N.Y. Sept. 25, 2018) (same).

Finally, in New York, if a parent believes that his or her child is being denied a FAPE, the parent may request an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by a local school board, *see* N.Y. Educ. Law § 4404(1)(a); *see also L.S.*, 2024 WL 1859970, at *13 ("Parents are entitled to challenge 'any matter relating to the identification, evaluation or educational placement of the student or the provision of a free appropriate public education to the student.'" (quoting N.Y. Educ. Law § 4404(1))).  The IHO's decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and the SRO's decision may be challenged in either state or federal court, *see* 20 U.S.C. § 1415(i)(2)(A); *see also L.O.*, 822 F.3d at 103 (describing the appeal process in New York); *L.S.*, 2024 WL 1859970, at *13 (same).

## B.  Standard of Review

Unlike an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in the IDEA context. *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam); *see also B.M.*, 2021 WL 4392281, at *10 (same); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 570 (S.D.N.Y. 2010) (same), *aff'd*, 486 F. App'x 954 (2d Cir. 2012) (summary order).  Instead, summary judgment in IDEA cases is "in substance an

21

appeal from an administrative determination, not a summary judgment." *Lillbask*, 397 F.3d at 83 n.3 (quotation marks omitted); *see also L.S.*, 2024 WL 1859970, at *13 ("[S]ummary judgment [in the IDEA context] 'is a pragmatic procedural mechanism for reviewing administrative decisions.'" (quoting *T.P.*, 554 F.3d at 252)). The Court's review therefore "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete de novo review." *L.O.*, 822 F.3d at 108 (quotation marks and italics omitted). Accordingly, the Court must "engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012) (quotation marks omitted); *accord B.M.*, 2021 WL 4392281, at *10.

However, such a review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206; *see also L.S.*, 2024 WL 1859970, at *12 (same). "To the contrary, federal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.H.*, 685 F.3d at 240 (quotation marks omitted). To merit deference, the IHO's and SRO's decisions must be "thorough and careful." *S.C.*, 175 F. Supp. 3d at 252 (quotation marks omitted); *accord Y.N.*, 2018 WL 4609117, at *14. The quality of the decision can be judged on factors such as whether it is "well-reasoned" and "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E.*, 694 F.3d at 189 (quotation marks omitted); *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 838 (2d Cir. 2014) (similar); *see also L.O.*, 822 F.3d at 109 ("To merit deference, the SRO's or IHO's factual findings must be reasoned and

supported by the record." (alteration and quotation marks omitted)).  "Additionally, the Second

Circuit has instructed courts that deference to an SRO's decision is more appropriate when the

substantive adequacy of an IEP, as opposed to the procedural adequacy, is at issue; when the

decision involves a dispute over an appropriate educational methodology versus determinations

regarding objective indications of progress; and when the district court's decision is based solely

on the administrative record that was before the SRO."  *B.M.*, 2021 WL 4392281, at *10 (citing

*M.H.*, 685 F.3d at 244).

 Where, as here, the IHO and SRO reach contrary conclusions, "reviewing courts are not

entitled to adopt the conclusions of either state reviewer according to their own policy

preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO

as the final state administrative determination."  *M.H.*, 685 F.3d at 246; *see also C.L.*, 744 F.3d at

838 (similar); *A.C.*, 553 F.3d at 171 (noting that "[i]f the SRO's decision conflicts with the

earlier decision of the IHO, the IHO's decision may be afforded diminished weight," because the

court must "defer to the final decision of the state authorities" (quotation marks omitted)).

However, if the Court concludes that

> the SRO's determinations are insufficiently reasoned to merit . . . deference, and in
> particular where the SRO rejects a more thorough and carefully considered decision
> of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's
> conclusions unpersuasive even after appropriate deference is paid, to consider the
> IHO's analysis.

*M.H.*, 685 F.3d at 246; *accord C.L.*, 744 F.3d at 838.  Therefore, this Court "must defer to the

SRO's decision on matters requiring educational expertise unless it concludes that the decision

was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered

instead."  *R.E.*, 694 F.3d at 189; *see also B.M.*, 2021 WL 4392281, at *10 ("The Second Circuit

has explained that the deference owed to an SRO's decision depends on the quality of that opinion, or its persuasiveness." (alterations and citation omitted)).

C.  Analysis

"Parents who believe that a FAPE is not being provided to their child may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (citation and alteration omitted); *L.S.*, 2024 WL 1859970, at *12 ("If a school district fails to offer a FAPE, parents may unilaterally enroll their child in private school and seek tuition reimbursement." (citation omitted)); *Bd. of Educ. of Poughkeepsie City Sch. Dist. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005) ("If a state receiving IDEA funding fails to give a disabled child a FAPE . . . the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state.").  To determine whether reimbursement is warranted, courts apply a three-part test known as the *Burlington*/*Carter* test "after [any] IEP dispute is resolved."  *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 526–27 & n.19 (2d Cir. 2020) (emphasis omitted) (discussing the test named after the Supreme Court's decisions in *Carter*, 510 U.S. 7, and *School Committee of the Town of Burlington v. Department of Education*, 471 U.S. 359, 369–71 (1985)).  Under this test, "[a] parent can obtain [tuition] reimbursement if: '(1) the school district's proposed placement violated the IDEA' by, for example, denying a FAPE to the student because the IEP was inadequate; (2) 'the parents' alternative private placement was appropriate'; and (3) 'equitable considerations favor reimbursement.'"  *Id*. at 526–27 (quoting *T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014)).

The Court will address the Parties' arguments with respect to each *Burlington*/*Carter* factor only to the extent necessary to resolve the instant Motion.

### 1. The District's Proposed IEP

With respect to the District's argument that M.L.'s IEP for the 2020–21 school year did, in fact, provide him a FAPE, the Court must first determine whether this issue is properly before it.

"It is well settled that the IDEA requires an aggrieved party to exhaust all administrative remedies before bringing a civil action in federal or state court[.]" *L.B. v. N.Y.C. Dep't of Educ.*, No. 21-CV-6626, 2023 WL 1779550, at *5 (S.D.N.Y. Feb. 6, 2023) (quoting *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 112 (2d Cir. 2004)); *accord Davis v. Carranza*, No. 19-CV-10123, 2021 WL 964820, at *11 (S.D.N.Y. Mar. 15, 2021). "Failure to exhaust [in this context] ordinarily deprives a court of subject-matter jurisdiction." *L.B.*, 2023 WL 1779550, at *5 (citing *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002), *abrogated on other grounds by Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142 (2023)); *see also W.R. on behalf of N.R. v. Katonah Lewisboro Union Free Sch. Dist.*, No. 21-CV-883, 2022 WL 17539699, at *8 (S.D.N.Y. Dec. 7, 2022) (similar).[18]

"To properly exhaust an adverse finding, a plaintiff must 'clearly specify the reasons for challenging the impartial hearing officer's decision [and] identify the findings, conclusions, and

---

[18] In *Luna Perez*, the Supreme Court held—contrary to prior Second Circuit precedent— that suits seeking damages under *another* federal law, such as the Americans with Disabilities Act ("ADA"), are not subject to the IDEA's exhaustion requirements. 598 U.S. at 147–48. Nothing in that case, however, purports to undermine the IDEA's exhaustion requirements as applied to claims brought under the IDEA itself. *See id.* at 147 (reasoning that 20 U.S.C. § 1415(*l*)—which extends the IDEA's exhaustion requirements to cover certain claims under the ADA and § 504 of the Rehabilitation Act—"applies only to suits that 'see[k] relief . . . also available under' [the] IDEA" (emphasis omitted)).

orders to which exceptions are taken.'" *W.R.*, 2022 WL 17539699, at *8 (quoting 8 N.Y.C.R.R. § 279.4(f)); *see also M.C. v. Mamaroneck Union Free Sch. Dist.*, No. 17-CV-1554, 2018 WL 4997516, at *23 (S.D.N.Y. Sept. 28, 2018) (upholding an SRO's dismissal of allegations set forth in an appeal where the appellants failed to identify the "precise rulings presented for review" and instead "parrot[ed] the language of the statute about what an IEP cannot do"). Further, in any answer and cross-appeal, a would-be appellant must set forth:

> (1) the specific relief sought in the underlying action or proceeding; (2) a clear and concise statement of the issues presented for review and the grounds for reversal or modification to be advanced, with each issue numbered and set forth separately, and identifying the precise rulings, failures to rule, or refusals to rule presented for review; [and] (3) citations to the record on appeal, and identification of the relevant page number(s) in the hearing decision, hearing transcript, exhibit number or letter and, if the exhibit consists of multiple pages, the exhibit page number[.]

8 N.Y.C.R.R. § 279.8(c)(1)–(3).  "Adverse findings not so identified on appeal to the SRO are 'deemed abandoned[.]'" *W.R.*, 2022 WL 17539699, at *8 (quoting 8 N.Y.C.R.R. § 279.8(c)(4)); *see also Davis*, 2021 WL 964820, at *11 ("[W]here a party abandons claims due to failure to comply with these content requirements, courts in this [D]istrict have found that the abandoned claims have not been exhausted." (collecting cases)); *AR on behalf of MR v. Katonah Lewisboro Union Free Sch. Dist.*, No. 18-CV-9938, 2019 WL 6251196, at *12 n.8 (S.D.N.Y. Nov. 21, 2019) (noting that the "[p]laintiffs, on appeal to the SRO, 'were obligated to clearly specify their reasons for challenging the IHO's decision; to identify the precise rulings presented for review; and to cite to the pertinent portions of the record on appeal.  Issues not so identified in the cross-appeal are properly deemed abandoned by the SRO." (quoting *M.C.*, 2018 WL 4997516, at *23)).

Although the Second Circuit has not addressed "the standard of review a district court should apply to a SRO's decision to dismiss claims based on a failure to comply with [the above-mentioned] content requirements[,] . . . courts in this [C]ircuit have used an 'arbitrary and

capricious' standard of review for dismissals on other procedural grounds." *Davis* , 2021 WL 964820, at *11 (citing *Avaras*, 2019 WL 4600870, at *10, and *T.W. v. Spencerport Cent. Sch. Dist.*, 891 F. Supp. 2d 438, 440 (W.D.N.Y. 2012)); *see also W.R.*, 2022 WL 17539699, at *9 ("The Court overturns an SRO's determination on abandonment only if the determination is arbitrary and capricious, such that it displays a clear error of judgment." (quotation marks omitted)).

In this case, the District's Answer and Cross-Appeal states that "[t]he IHO incorrectly found that the District failed to provide [M.L.] with a FAPE for the 2020–2021 school year.  The IHO failed to consider the totality of the program offered to [M.L.] for the 2020–2021 school [year] when finding that the District failed to provide [him] with a FAPE for the 2020–2021 school year."  (Answer & Cross-Appeal ¶ 6.)[19]  The SRO explained that, "[a]lthough the IHO made specific findings that the recommended ICT services in science were not appropriate and that the lack of a regular education teacher at the May 2020 CSE meeting rendered the May 2020 IEP inappropriate, these issues were not specifically raised in the [D]istrict's [A]nswer [and] [C]ross-[A]ppeal and were only raised in the [D]istrict's memorandum of law."  (SRO Op. 9; *see also id.* at 10 ("Instead of specifically addressing the findings made by the IHO, the [A]nswer and [C]ross-[A]ppeal includes a conclusory allegation that the IHO erred in finding that the [D]istrict failed to offer [M.L.] a FAPE for the 2020–21 school year.").)  Thus, the SRO concluded that the District had "failed to properly plead that the IHO erred in determining that the district denied [M.L.] a FAPE and the IHO's finding on the [D]istrict's failure to offer the student a FAPE for the 2020–21 school year has become final and binding."  (*Id.* at 10.)

---

[19] The District's Answer and Cross-Appeal was provided by the Office of State Review with the administrative record as a "Pleading," and is on file with the Court.

In light of the legal principles set forth above—far from being arbitrary and capricious—the SRO's conclusion was plainly correct.  The District simply failed to follow the relevant New York state rules, which provide, among other things, that answers and cross-appeals must set forth "the precise rulings . . . presented for review[] . . . citations to the record on appeal, and identification of the relevant page number(s) in the hearing decision," 8 N.Y.C.R.R. § 279.8(c)(2)–(3), as well as the specific "reasons for challenging the [IHO's] decision" and the "conclusions[] . . . to which exceptions are taken," *id.* § 279.4(f).  Merely asserting that the IHO "incorrectly found that the District failed to provide [M.L.] with a FAPE" by "fail[ing] to consider the totality of the program offered to [M.L.,]" (*see* Answer & Cross-Appeal ¶ 6), does not raise the precise rulings presented for review—i.e., that the IHO erred in holding that the CSE's recommendation for M.L. to enroll in an ICT science class was inappropriate based on his needs and that the CSE impermissibly lacked a general education teacher given that recommendation, (*see* IHO Op. 18)—nor, it bears noting, did the District provide the SRO with any citations to the record on appeal or the relevant page numbers in the IHO's decision.  *See M.C.*, 2018 WL 4997516, at *23 (concluding that a cross-appeal "fail[ed] to identify the precise rulings presented for review and [] fail[ed] to cite to the pertinent portions of the record on appeal, as required in order to raise an issue on cross-appeal" under New York's pleading requirements where the cross-appeal stated:  "Petitioners appeal from the IHO's determination regarding the procedural inadequacies in the development of the Student's IEPs in so far [sic] as these inadequacies impeded the Student's right to a FAPE, significantly impeded the Parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, and caused a deprivation of educational benefits."); *see also W.R.*, 2022 WL 17539699, at *8 (determining that "[t]he SRO [] did not err in deeming abandoned" certain grounds for appeal

relating to the defendant-school district's alleged failure to provide a FAPE where the parents' cross-appeal did not identify "precise rulings for review" (quotation marks omitted)).

In its opening brief, the District does not argue that the SRO's decision on the FAPE issue was arbitrary and capricious. (*See* Pl's Mem. 14–15.) Instead, the District asserts— without citation—that the "SRO's decision in this [c]ase contained striking ad hominem attacks" that were "gratuitous and unbecoming." (*Id.* at 15 (italics omitted).) A close review of the SRO's decision, however, reveals that the SRO provided only a measured admonition to the District's counsel, given that "this [was] not the first time that the law firm for the [D]istrict ha[d] failed to properly plead its arguments." (SRO Op. 11 ("Th[e separate] matter went against a school district represented by the same law firm as the firm filing the cross-appeal on behalf of the [D]istrict in this proceeding, albeit with representation by a different attorney within the firm. However, considering it was the same law firm, the attorney should have been aware of the outcome of that matter, especially as it related to the manner in which the firm prepares its pleadings. . . . [C]ounsel for the [D]istrict is cautioned to review the regulations governing practice before the Office of State Review and to comply with them in the future.").)[20]

---

[20] The Court notes that the District did cite a number of cases, purportedly standing for the proposition that the "SRO [erroneously] raised this issue [regarding its pleading failures] on his own without giving the District the opportunity to respond to it." (Pl's Mem. 14–15.) However, none of the District's cases supports that proposition (or are even relevant thereto) because they concern, at most, situations where SRO-analogues exceeded their authority by addressing substantive issues sua sponte without the benefit of an adequate record, and the Court is aware of no limitation on SROs' ability to address procedural defects in the pleadings before them consistent with New York law. *See Hiller by Hiller v. Bd. of Educ. of Brunswick Cent. Sch. Dist.*, 674 F. Supp. 73, 77 (N.D.N.Y. 1987) (concluding that the Commissioner of the New York State Department of Education exceeded the scope of his authority under a predecessor to the IDEA, where he reversed a CSE's finding that a child was handicapped, notwithstanding the fact that that substantive issue had not been raised on appeal); *Mifflin Cnty. Sch. Dist. v. Special Educ. Due Process Appeals Bd.*, 800 A.2d 1010, 1014 (Pa. Commw. Ct. 2002) (concluding that a Pennsylvania Special Education Due Process Appeals Review Panel "overstepped its authority by raising sua sponte the appropriateness of" a certain multi-disciplinary evaluation because

On Reply, the District asserts that the SRO's decision was capricious because the "exact same SRO" who served in this case previously decided that "the lack of a general education teacher did not cause [the] deprivation of [a] FAPE when a teacher dually[-]certified in special education and general education was present at [a] CSE meeting," but in this case adopted the IHO's FAPE holding notwithstanding the fact that it was directly contrary to the SRO's previous holding. (*See* Pl's Reply 6–7 (emphasis omitted)). But, in making this argument, the District misses the point entirely; the inquiry here is whether the SRO's decision *on the procedural issue itself* was arbitrary and capricious. *See Davis*, 2021 WL 964820, at *11. The Court discerns nothing arbitrary or capricious about the SRO's well-reasoned conclusion that the District failed to adequately plead its FAPE-related arguments in its Answer and Cross-Appeal.[21]

---

allowing the Panel to do so "without the benefit of a full factual record and adjudication on the issue, [would] result[] in a premature interruption of the administrative process"); *Application of a Child with a Disability*, Appeal No. 06-139 (agreeing with the IHO's decision not to consider certain of the petitioner's substantive arguments under the IDEA that had not been raised in the underlying due process complaint); *see also Daimler Chrysler Ins. Co. v. Keller*, 83 N.Y.S.3d 599, 600 (App. Div. 2018) (explaining—in a subrogation action—that the trial court erred in granting summary judgment on a ground that no party had raised); *Lombardo v. Mastec N. Am., Inc.*, 893 N.Y.S.2d 78, 80 (App. Div. 2009) (concluding in a personal injury case that the trial court erred in "raising and considering a claim of vicarious liability" more-or-less on the plaintiff's behalf given that such a theory was not raised "either in the [years-old] complaint or in opposition to the [relevant] motion"); *Orlich v. Helm Bros.*, 560 N.Y.S.2d 10, 13 (App. Div. 1990) (noting—in an action raising theories of negligent design, breach of warranty, and strict products liability filed following a car accident—the appellate court's "disapproval of the [trial] court's usurpation of the advocate's role in delineating a theory of liability," where the trial court had come up with its own theory of liability based on sources from outside of the record).

[21] Nor is the Court convinced by the District's reliance on the Second Circuit's decision in *C.L. v. Scarsdale Union Free School District*. (*See* Pl's Reply 6.) In *C.L.*, the court held that "the SRO's decision [on the appropriateness of the student's placement at Eagle Hill] was not sufficiently reasoned or carefully considered because the SRO did not consider or comment on any of the specific services provided to [the student] at Eagle Hill or the progress that the record shows he made at the school." 744 F.3d at 838. Here, in connection with his determination that the District did not properly plead the FAPE aspect of its cross-appeal, the SRO *did* provide adequate reasoning as discussed above. (*See* SRO Op. 9–10.) And, as discussed in further detail

Finally, the Court recognizes that "[e]xhaustion is not required if '(1) it would be futile to resort to the IDEA's due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; or (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies.'" *L.B.*, 2023 WL 1779550, at *5 (quoting *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002)). However, the District bears the burden of "proving the applicability of one of these exceptions," given that it is "the party seeking to avoid exhaustion[,]" and it has made no effort to meet that burden. *See Murphy*, 297 F.3d at 199.

In sum, the Court concludes that the District failed to exhaust—and therefore abandoned—its argument that its proposed IEP for the 2020–21 school year provided a FAPE to M.L. *See* 8 N.Y.C.R.R. § 279.8(c)(4). Thus, the Court will not disturb the IHO's decision on this issue, which has been rendered final and binding, 8 N.Y.C.R.R. § 200.5(j)(5)(v) ("The decision of the [IHO] shall be binding upon both parties unless appealed to the [SRO]."); *see also* 34 C.F.R. § 300.514 (providing for the finality of administrative decisions rendered pursuant to the IDEA), and therefore denies the District's Motion insofar as it seeks to undo the IHO's finding that it failed to provide a FAPE to M.L. for the 2020–21 school year.[22]

### 2. The Parents' Unilateral Placement at Eagle Hill

Turning to the second *Burlington*/*Carter* factor, which asks whether the Parents' "alternative private placement [at Eagle Hill] was appropriate," *Ventura de Paulino*, 959 F.3d at

---

below, the SRO's determination as to the appropriateness of Eagle Hill was both "sufficiently reasoned" and "carefully considered." (*See id.* at 11–22.)

[22] Given that the District failed to exhaust the FAPE issue, the Court cannot—and will not—opine on the District's arguments that the IHO erred in determining that it failed to offer M.L. a FAPE for the 2020–21 school year. (*See* Pl's Mem. 15–22.)

526 (citation omitted), the District argues that the SRO erred in concluding that the Parents had

established the appropriateness of Eagle Hill for M.L. and that this Court should therefore defer

to the IHO's determination that Eagle Hill was *not* an appropriate placement for him.  (*See* Pl's

Mem. 22–25.)

  "Where a school district denies a disabled child a FAPE, the parents may place the child

in an appropriate private school and then seek tuition reimbursement from the school district."

*C.L.*, 744 F.3d at 835–36.  At this stage of the *Burlington*/*Carter* analysis, the private school

placement must be found to be "reasonably calculated to enable the child to receive educational

benefits[,]" *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 146 (2d Cir. 2019) (quoting

*M.H.*, 685 F.3d at 252), "such that the placement is likely to produce progress, not regression,"

*T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 877 (2d Cir. 2016) (quoting *C.L.*, 744 F.3d at 836).

"[T]he unilateral private placement is only appropriate[, however,] if it provides education

instruction *specially* designed to meet the *unique* needs of a handicapped child."  *W.A.*, 927 F.3d

at 146 (emphases in original) (alteration adopted) (quoting *M.H.*, 685 F.3d at 252); *accord*

*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007).  "Grades, test scores,

and regular advancement may constitute evidence that a child is receiving educational benefit,

but courts assessing the propriety of a unilateral placement consider *the totality of the*

*circumstances* in determining whether that placement reasonably serves a child's *individual*

needs."  *W.A.*, 927 F.3d at 146 (emphases added) (quoting *Frank G. v. Bd. of Educ. of Hyde*

*Park*, 459 F.3d 356, 364 (2d Cir. 2006)); *see also T.K.*, 810 F.3d at 877 ("In determining whether

a placement reasonably serves the educational needs of a child with a disability and is likely to

produce progress, we consider *the totality of the evidence*, including 'grades, test scores, regular

advancement, or other objective evidence.'" (emphasis added) (quoting *C.L.*, 744 F.3d at 836)).

"No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits." *Gagliardo*, 489 F.3d at 112 (citation omitted). And, importantly, "[t]he test for private placement 'is that it is appropriate, and not that it is perfect.'" *T.K.*, 810 F.3d at 877–78 (quoting *C.L.*, 744 F.3d at 837).

Although "parents bear the burden of showing that the private placement they selected was appropriate for the child," *C.L.*, 744 F.3d at 836, they "bear a lower burden to demonstrate the appropriateness of a private placement than school districts do to demonstrate the provision of a FAPE because 'parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a FAPE[,]'" *T.K.*, 810 F.3d at 878 (alteration adopted) (quoting *Frank G.*, 459 F.3d at 364). And, in terms of deference, insofar as an SRO's decision on the appropriateness of parents' unilateral placement of their child is "well[-]reasoned[,]" it "is entitled to deference because it involves a matter 'requiring educational expertise.'" *S.B. v. N.Y.C. Dep't of Educ.*, No. 21-CV-9139, 2022 WL 3997016, at *6 (S.D.N.Y. Sept. 1, 2022) (quoting *W.A.*, 927 F.3d at 144); *see also Bd. of Educ. of Wappingers Cent. Sch. Dist. v. M.N. ex rel. J.N.*, No. 16-CV-9448, 2017 WL 4641219, at *9 (S.D.N.Y. Oct. 13, 2017) ("The appropriateness of a student's placement is a determination that requires educational expertise, and thus [well-reasoned decisions on that issue] should be accorded deference." (collecting cases)). Moreover, it bears reiterating that in cases like this, "where the IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts *must* defer to the *reasoned* conclusions of the SRO as the final state administrative determination." *M.H.*, 685 F.3d at 246 (emphases added).

Mindful of its obligation to defer to reasoned conclusions of the SRO, the Court agrees that—considering the totality of circumstances in this case—the Parents have carried their burden to show that Eagle Hill was appropriate for M.L.'s individual needs. As the SRO's decision, along with the record evidence upon which he relied, demonstrate, M.L. faced numerous challenges in connection with his education. (*See* SRO Op. 12–15.) *See also* Section I.A.2. Specifically, he had difficulties with reading comprehension, focusing in the classroom, arriving to class on time, following directions, and understanding social cues, among other things. (*See* SRO Op. 12–14.) Further, a psychological evaluation of M.L. reflected concerns about his ability to form social connections with peers and pay attention in school, as well as his impulsiveness and defiance. (*See id.* at 14.) The SRO also observed that, according to a speech-language pathologist, M.L. "require[d] in-the-moment support to consider the social nuances of presented situations, was long-winded in nature[,] which caused the listener to have difficulty following his intended message, and [] struggled with the initiation piece of social interactions," and, in addition, that M.L. "had notable difficulty with his executive function skills and presented with significant weakness in task initiation, attentional regulation, sequencing, and central coherence." (*Id.* at 14–15 (quotation marks omitted); *see also id.* at 15 ("The speech-language pathologist concluded that the student benefitted greatly from highly structured learning environments and that it was 'crucial' that he continue to receive specialized intervention in the areas of social cognition and higher-order thinking skills to successfully navigate the increasingly abstract nature of the academic curriculum and peer-relationships." (citation omitted)).)

The SRO also considered the degree to which Eagle Hill's programing—based on the record evidence—addressed M.L.'s individual needs. (*See id.* at 16–22.) In particular, the SRO

determined, contrary to the IHO, that the testimony given by Eagle Hill's Director of Placement "explained facets of [] Eagle Hill['s] programming and [] information specific to [M.L.] contained in [his] progress reports," which supported the Parent's assertion that Eagle Hill was an appropriate placement for him.  (*Id.* at 16 ("The Eagle Hill [D]irector [of Placement] described the nonpublic school as a small, coeducational kindergarten through eighth grade school that served students whose diagnoses could include ADHD, dyslexia, dysgraphia, processing disorders, executive functioning issues, social pragmatic issues, and language disorders.")  The SRO also explained that the programming at Eagle Hill, as evidenced by M.L.'s progress reports, indicated that he generally attended classes with less than ten other students that directly addressed M.L.'s educational needs in myriad ways, *and* that he was making notable progress toward his educational goals in those classes.  (*See id.* at 16–18; *see also id.* at 18–19 (explaining that M.L.'s progress at Eagle Hill continued into 2021 as reflected in his June 2021 progress report).)  For example, the SRO noted that M.L.: "attended a [forty]-minute math class daily with a student to teacher ratio of 4:1 where the areas of emphasis included numeration/place value/number sense, word problems, computation, and practical applications"; "was demonstrating that he could independently determine the question asked in a word problem and with supports, was working toward skills such as demonstrating an understanding of math vocabulary, determining relevant information, identifying the correct operation to use, utilizing instructed strategies, checking the validity of an answer, and solving one-step and multi-step problems"; and "was provided with and benefitted from frequent review of previously instructed concepts, cues to try a problem first before seeking teacher support, discussion of key words, and highlighting important information."  (*Id.* at 17 (quotation marks omitted).)

In addition, with respect to M.L.'s aforementioned "needs in reading comprehension, the December 2020 [Eagle Hill] progress report [for M.L.] stated that [he] demonstrated independent skills in providing the main idea and identifying supporting details, and with support and direct instruction, he was working on skills including summarizing text in oral and written format, making predictions, using comprehension moderating strategies such as rereading and note taking, and discriminating between relevant and nonrelevant information." (*Id.* at 16–17.) Further, the "progress report indicated that the student was provided with and benefitted from supports and strategies such as clear consistent expectations, models that visually presented new information in order to increase self-regulation and confidence, stopping to think and discuss new information, and breaking reading materials down into manageable sections." (*Id.* at 17; *see also* Hearing Tr. 405:15–23 (testimony of Eagle Hill's Director of Placement noting, with regard to his reading instruction, that M.L. "in particular [] really benefitted from [] consistent information from working with [the] same teacher, having strategies to think and discuss materials, simulating new information to utilize all the things that he learned in isolation and that is what the two periods of his day were being used for").)

As to the psychological services that M.L. received at Eagle Hill, the SRO indicated that he "was working toward long-term goals of improving social awareness and perspective taking, improving emotion regulation, and developing a better understanding of the role anxiety plays in personal interactions," and that he was working on various goals, including "accurately identifying the problem in a social scenario/conflict, generating possible solutions, identifying the probable thoughts and feelings of each individual involved, independently choosing a coping strategy when frustrated or overwhelmed, identifying triggers to this reaction when upset or overwhelmed, demonstrating control over outwardly verbalizing negative thoughts, and

expressing levels of anxiety within a problematic situation." (SRO Op. at 18 ("The Eagle Hill [D]irector [of Placement] testified that not all Eagle Hill students received psychological services, but that in [M.L.'s] case, staff worked on developing [his] social awareness and perspective taking skills, improving his emotional regulation, and understanding the role anxiety played in his personal interactions.").)

The SRO also noted that M.L. attended a pragmatic, speech-language group—which was not offered to all Eagle Hill students—where he was provided "explicit instruction and opportunities to practice concepts of language-based social thinking skills with [an] emphasis on non-verbal language, conversation, and group skills." (*Id.* at 18 (explaining that M.L. worked on "reading and sending non-verbal cues, participating in group conversations, maintaining a conversation with on-topic and appropriate comments, expressing feelings or opinions appropriately in a group setting, compromising and being flexible, and working with others on a group project" in this class).) Eagle Hill staff determined that this group was appropriate for M.L. specifically because his "pragmatic language skill needs were interfering with his ability to learn." (*Id.*)

In addition to the foregoing, the SRO discussed M.L.'s June 2021 progress report from Eagle Hill, which described M.L.'s progress in his remedial reading class, including his "significant progress in developing organizational skills in order to be more actively engaged." (*Id.* at 18–19 (quotation marks omitted) (stating that M.L. "developed a greater awareness and independence in using strategies that increase his success when decoding, comprehending, and writing; and successfully wrote essays after reading articles").) And, importantly, the SRO explained:

> [T]he June 2021 progress report stated that [M.L.] had made improvements overall in managing his anxiety even though he continued to struggle with social

> interactions, that he had made excellent use of his time in counseling noting that as
> the year progressed he required less time in crisis management, and that over time
> he had responded better to redirection and assistance in "moving on" when he was
> feeling overwhelmed by emotions or academics.

(*Id.* at 19.)

Based upon the record evidence discussed at length above and in the SRO's thorough decision, the Court has little trouble concluding that that decision is "supported by 'the preponderance of the evidence[.]'" *S.B.*, 2022 WL 3997016, at *5 (quoting *Frank G.*, 459 F.3d at 367); *cf. W.A.*, 927 F.3d at 149 ("[T]he reviewing court should only reject the SRO's conclusions if it finds that they are not supported by a preponderance of the evidence." (citing *M.H.*, 685 F.3d at 248)).

In support of its Motion, the District's primary argument is that the Parents did not meet their burden to establish the appropriateness of Eagle Hill because the record lacks "objective evidence" of M.L.'s progress.  (*See* Pl's Mem. 22–25.)  Indeed, in making this argument, the District goes so far as to assert that "the Second Circuit *requires* objective evidence of progress." (*Id.* at 22 (emphasis added); *see also* Pl's Reply 10 (asserting, without citation that "[t]he Second Circuit requires objective evidence of progress from individuals who know the child's unique needs").)  In making that assertion, however, the District misstates the law.  Specifically, the District cites *Hardison v. Board of Education of the Oneonta City School District*, but that case states that objective evidence of progress "is *preferable* under the law of th[e Second] Circuit[,]" not *required*.  773 F.3d 372, 387 (2d Cir. 2014) (emphasis added) (citing *Frank G.*, 459 F.3d at 364, 366).[23]  And as the Court has already explained, the focus of this inquiry is on "*the totality*

---

[23] *Hardison* is also distinguishable on its facts.  In that case, the Second Circuit reviewed an SRO's determination that the parent's failed to demonstrate that their private placement was appropriate.  *See Hardison*, 773 F.3d at 386–88.  Although the district court had disagreed with the SRO, the Second Circuit upheld the SRO's conclusion, in part because "the bulk of the evidence" regarding the student's progress at the private placement came from a witness—Mr.

*of the circumstances* [surrounding] whether th[e private] placement reasonably serves a child's *individual* needs." *W.A.*, 927 F.3d at 146 (emphases added) (citation omitted); *see also T.K.*, 810 F.3d at 877 (stating that courts "consider *the totality of the evidence*" when "determining whether a placement reasonably serves the educational needs of a child with a disability and is likely to produce progress" (emphasis added) (citation omitted)).[24]

Relatedly, it is unclear to the Court why the District is so vehement in arguing that the record lacks objective evidence. (*See* Pl's Mem. 22–23; Pl's Reply 8–9.) At minimum, M.L.'s Eagle Hill progress reports, dated December 2020 and June 2021, set forth: the specific skills M.L. could complete on his own and with assistance; narratives prepared by teachers with their observations of M.L.'s in-class performance and progress; and teacher assessment grids reflecting M.L.'s academic and interpersonal abilities, with a four-part scale ranging from "With direct support" to "Independent[.]" (*See generally* Parents' Exs. 7–48; *see also* SRO Op. 20 (noting that these progress notes "are not entirely subjective as they identify the specific areas the student was working on and the progress that the student made in those areas").) Such

_____

Brain—who testified that "was progressing well psychologically." *Id.* at 387. The Second Circuit was unimpressed with Mr. Brain's testimony because he was "not a certified psychologist in New York or the state where he obtained his Master's degree," and, in any event, he "did not know any details of how [the student] was progressing academically or how her psychological progress tied into her educational progress." *Id.* As noted above, however, the evidence of M.L.'s progress at Eagle Hill was far more robust.

[24] Nor is the Court convinced that *R.H. v. Board of Education Saugerties Central School District*, No. 16-CV-551, 2018 WL 2304740 (N.D.N.Y. May 21, 2018), effects the outcome here. (*See* Pl's Mem. 24.) In that case, as in *Hardison*, the district court noted that objective evidence of progress was "preferable," not required. *See R.H.*, 2018 WL 2304740, at *7. Further, the court explained that the record contained *no* progress notes, "nor any testimony concerning what goals or issues were addressed in counseling, occupational therapy[,] or speech-language therapy." *Id.* On that basis, the court deferred to "the SRO's well-reasoned decision[,]" given its reluctance "to substitute its own view of sound educational policy for the more experienced and specialized views of the SRO." *Id.* Although the ultimate outcome is different, the Court is simply applying the same of standard of deference in this case.

information would, of course, "relate[] to" or be "based on externally verifiable phenomena"—namely, M.L.'s performance in school.  *Objective*, Black's Law Dictionary (12th ed. 2024).[25]

The Court is also unpersuaded by the District's reliance on *L.K. ex rel. Q v. Northeast School District*, 932 F. Supp. 2d 467 (S.D.N.Y. 2013).  (Pl's Mem. 24–25.)  For starters, the court in *L.K.* relied in part on the now-overruled portion of the district court decision in *C.L.* to support its conclusion.  *See L.K.*, 932 F. Supp. 2d at 491 (citing *C.L. v. Scarsdale Union Free Sch. Dist.*, No. 10-CV-4315, 2012 WL 983371, at *12 n.17 (S.D.N.Y. Mar. 22, 2012)).  And although the court in *L.K.* reasoned that a private school's progress reports "did not provide objective measurements of performance but instead assessed [the student's] abilities within broad parameters identified as 'beginning,' 'developing,' and 'secure[,]'" *id.*, the District does not argue that Eagle Hill's progress reports for M.L. suffer from the same infirmities, (*see* Pl's Mem. 24–25; Pl's Reply 8–10).[26]  Indeed, in deferring to the IHO decision that Eagle Hill was an

---

[25] The District separately argues that the Parents' evidence is insufficient to carry their burden because their witnesses at the impartial hearing lacked "direct knowledge of M.L.'s program or progress at Eagle Hill," they provide "no standardized data or assessments [that] evaluate[d] M.L.'s performance[,]" and the evidence contained "informal assessments" only.  (Pl's Mem. 22–23.)  But these arguments go to nothing more than the weight of the evidence, and, again, in light of the deferential treatment afforded to reasoned SRO decisions, the Court will not second guess the SRO's assessment of the totality of the record evidence in this case.

[26] Although the District suggests that the Parents were required to have M.L.'s teachers testify before the IHO, (*see* Pl's Mem. 24), it cites no caselaw setting forth such a requirement and, in any event, the SRO properly determined that the lack of any testimony from M.L.'s went only to the weight of the totality of the Parents' evidence, (*see* SRO Op. 20 ("[T]he fact that the teachers who completed the progress reports did not testify at the impartial hearing could be used as a reason for attributing less weight to the submitted and accepted evidence; however, the evidence presented is uncontroverted and should not be outright dismissed.")).  Moreover, the Court notes that the impartial hearing took place over the course of four *school* days—September 21, September 30, October 3, and October 20, 2022.  (*See* IHO Op. 6.)  *See also Fellows v. Baker*, No. 20-CV-139, 2021 WL 4200875, at *15 n.6 (D. Vt. Mar. 10, 2021), *report and recommendation adopted*, 2021 WL 4199285 (D. Vt. Sept. 15, 2021) (explaining that a court "may take judicial notice of facts established by a calendar, as the accuracy of a calendar cannot be reasonably questioned" (collecting cases)).

appropriate placement where the SRO had not even "examine[d the student's] progress at Eagle Hill," the Second Circuit in *C.L.* explained that the student's "progress reports and the testimony of Eagle Hills Director of Admissions" supported the IHO's determination.  744 F.3d at 839.[27]

Finally, the District contends that the SRO impermissibly "discounted the fact that Eagle Hill was not the least restrictive environment for M.L."  (Pl's Mem. 23; *see also* Pl's Reply 9.) To be sure, under the IDEA there is a "'strong preference' for educating disabled students alongside their non-disabled peers; that is, in their least restrictive environment."  *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 143 (2d Cir. 2013) (citing *Walczak*, 142 F.3d at 122).  But, the Second Circuit has made clear that, although "the restrictiveness of a private placement is a factor, by no means is it dispositive" in the appropriateness analysis.  *C.L.*, 744 F.3d at 837 ("Restrictiveness may be relevant in choosing between two or more otherwise appropriate private placement alternatives, or in considering whether a private placement would be more restrictive than necessary to meet the child's needs, *but where the public school system denied the child a FAPE, the restrictiveness of the private placement cannot be measured against the restrictiveness of the public school option*." (emphasis added)).  Indeed, when explaining the law on this issue, the *C.L.* court noted that "parents whose children are denied a FAPE may be and often are forced to turn to specialized private schools that educate only disabled children[,]" like Eagle Hill.  *Id.*  Thus, the SRO did not err in giving little weight to the fact that Eagle Hill did not provide the least restrictive educational environment for M.L.  (*See* SRO Op. 22.)

---

[27] In citing *C.L.*, the Court in no way suggests that unilateral placements at Eagle Hill are appropriate as a matter of law.  Instead, as noted, this inquiry requires courts to "consider the totality of the circumstances [to] determine[e] whether th[e] placement reasonably serves a child's *individual* needs."  *C.L.*, 744 F.3d at 836 (emphasis added) (citation omitted).

To summarize—on this record, the Court defers to the SRO's reasoned conclusion as to the appropriateness of M.L.'s placement at Eagle Hill for the 2020–21 school year. Accordingly, the District's Motion is denied to the extent that it seeks to overturn that conclusion.

### 3.  Equitable Considerations

Having deferred to the SRO's decision with respect to the appropriateness of Eagle Hill, the Court turns to the third and final *Burlington*/*Carter* factor—whether equitable considerations favor the Parents' request for tuition reimbursement.  *See Ventura de Paulino*, 959 F.3d at 526–27.

Under the IDEA, courts "*may* require [a local education] agency to reimburse the parents for the cost of [private school] enrollment" upon a finding that "the agency had not made a [FAPE] available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii) (emphasis added).  That ability, however, is not without limitations.  As relevant here, the IDEA provides that reimbursement for private school enrollment may be "reduced or denied . . . upon a judicial finding of unreasonableness with respect to actions taken by the parents." *Id.* § 1412(a)(10)(C)(iii)(III).

"The authority to grant reimbursement is discretionary—the court 'has broad discretion to consider the range of all relevant facts in determining whether and to what extent awarding relief is equitable.'"  *M.N.*, 2017 WL 4641219, at *9 (S.D.N.Y. Oct. 13, 2017) (quoting *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 671 (S.D.N.Y. 2011)); *see also Gagliardo*, 489 F.3d at 112 (noting that courts "enjoy broad discretion in considering equitable factors relevant to fashioning relief" in this context (citing *Carter*, 510 U.S. at 16)).  One important consideration is "whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA." *C.L.*, 744 F.3d at 840; *see also Frank*

*G.*, 459 F.3d at 363–64 (explaining that "equitable considerations relating to the reasonableness of the action taken by the parents are relevant in fashioning relief" (alteration adopted) (citation omitted)).  As the Supreme Court put it, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant—for instance, if the parents failed to give the school district adequate notice of their intent to enroll the child in private school."  *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009) ("In considering the equities, courts should generally presume that public-school officials are properly performing their obligations under IDEA.").

As with showing that a given private school placement is appropriate, parents "bear the burden of showing . . . that the equities weigh in their favor."  *C.L.*, 744 F.3d at 836 (citing *R.E.*, 694 F.3d at 184–85); *see also W.A.*, 927 F.3d at 146 (same).  Moreover, district courts in the Second Circuit regularly determine that "state agency conclusions on the equities analysis are entitled to less deference."  *Z.A.R. v. City of New York*, No. 19-CV-2615, 2022 WL 4536241, at *4 (E.D.N.Y. Sept. 28, 2022) (collecting cases); *see also W.M. v. Lakeland Cent. Sch. Dist.*, 783 F. Supp. 2d 497, 504 (S.D.N.Y. 2011) ("[D]eference is less weighty here where the issue in dispute is the balancing of the equities, a matter as to which district courts not only have particular expertise but also broad discretion."); *J.S.*, 826 F. Supp. 2d at 659 (same).

Here, the record evidence shows that the Parents actively participated in the May 1, 2020 CSE meeting during which the IEP at issue was discussed and developed.  (*See* Dist. Exs. 78–79.)  In addition, E.L. testified that he and C.S. visited the proposed public school placement for M.L.  (*See* Hearing Tr. 481:11–482:22.)  However, he did not recall whether the Parents were able to visit the proposed public school placement in 2020 before the 2020–21 school year, given

that there were certain pandemic-related restrictions in place at the time. (*See id.* at 482:23–483:10.)[28]

On the other hand, as the SRO noted—and as the Parents concede—the Parents did not "submit to the [D]istrict 10-business-day notice of the unilateral placement at Eagle Hill." (SRO Op. 24; *see also* Def's Opp'n 26 ("[T]he SRO properly considered the Parents['] failure to submit a timely Ten Day Notice.").)[29]  In fact, based on the record before it, the Court can only conclude that the Parents did not inform the District about their dissatisfaction with the IEP for M.L. until they filed their Due Process Complaint on April 28, 2022—nearly two years after the May 1, 2020 CSE meeting and approximately ten months after the end of the school year at issue. (*See generally* Due Process Complaint; *see also* Hearing Tr. 481:5–8 ("Q.  Did you have concerns or raise concerns about [the recommendation to have M.L. attend an ICT class for science]?  A.  I don't know if we raised concerns at the time.").)  The Court reiterates at this juncture that the *Parents* bear the burden of showing that the equities are in their favor, *see W.A.*, 927 F.3d at 146, yet they have pointed to no evidence that they provided any real notice to the District regarding any concerns they had with the IEP before the 2020–21 school year began.

---

[28] Although the Parents are not wrong in asserting that "the District's conduct and failures leading up to the school year [are] relevant" for purposes of the equities analysis, they point to no such misconduct or failures beyond the District's failure to provide M.L. a FAPE. (Defs' Opp'n 26, 28.)  However, as noted, the IHO only found that the 2020–21 IEP did not offer M.L. a FAPE because (1) it recommended placement in an ICT class for science, and (2) no general education teacher attended the May 1, 2020 CSE meeting even though the IEP contained that recommendation. *See supra* Section I.A.5. Given that these issues could have been remedied had the Parents provided notice to the District, the Court affords little weight to this fact.

[29] "If parents decide to make a private placement and intend to seek tuition reimbursement, the first step is generally for them to give the school district ten days' prior written notice of their intention and to include in that notice a statement of their concerns regarding the school district's proposed IEP." *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152, 159 (2d Cir. 2021).

And, importantly, by failing to notify the District of their intention to send M.L. to Eagle Hill, the Parents deprived the District of the opportunity "to reassess the IEP and cure any deficiency in it, [which could have] minimiz[ed] the [District's] expenses by allowing it to adjust its plans and provide [M.L.] with what the [P]arents, at least, consider to be a FAPE." *C.S.*, 990 F.3d at 159 (citing *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir. 2000); *J.S.*, 826 F. Supp. 2d at 672)).[30]  Indeed, the very purpose of the IDEA's notice requirement is to give a "school system an opportunity, *before the child is removed*, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a FAPE can be provided in the public schools." *J.S.*, 826 F. Supp. 2d at 672 (emphasis in original) (quoting *R.B. v. N.Y.C. Dep't of Educ.*, 713 F. Supp. 2d 235, 248 (S.D.N.Y.2010)).  Put simply, it was patently unreasonable for the Parents to wait as long as they did to file their Due Process Complaint under these circumstances.  *See Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 158 (3d Cir. 1994) (explaining that waiting "more than two years, indeed, more than one year, without mitigating excuse" between a unilateral placement and the initiation of due process proceedings constitutes

---

[30] Specifically, the Parents' delayed notice deprived the District of the opportunity to hold a statutory resolution meeting.  As the Second Circuit has explained, "[o]nce a due process complaint has been filed, a school district must arrange a meeting between the parents and the relevant members of the CSE to occur within fifteen days of the filing." *C.S.*, 990 F.3d at 161 (citing 20 U.S.C. § 1415(f)(1)(B)).  "The purpose of the [so-called] resolution session [or meeting] is 'for the parent of the child to discuss the due process complaint, and the facts that form the basis of the due process complaint, so that the [school district] *has the opportunity to resolve the dispute* that is the basis for the due process complaint.'" *Id.* (emphasis added) (quoting 34 C.F.R. § 300.510(a)).  Here, the record does not reflect whether a resolution meeting took place, but even if it did, the fact that it would have taken place so long after the school year at issue would have rendered it virtually meaningless, at least insofar as the dispute concerned the IEP for M.L.

"an unreasonable delay"); *see also M.C.*, 226 F.3d at 68 (citing *Bernardsville Board of Education* with approval).[31]

The District argues that tuition reimbursement should be entirely denied here because the Parents never actually intended to send M.L. to public school. (*See generally* Pl's Mem. 26–31.) It is true that the Parents signed a re-enrollment contract with Eagle Hill just a few weeks after C.S. submitted the District form titled Resident Student Parentally Placed in Non-Public Schools Outside of District Planning for the 2020–21 School Year. (*See* Parents' Exs. 4–6; *see also* Dist. Exs. 75.) However, C.S. made clear on the District's form that "[w]e have not decided on a program for the 2020–21 school year, we would like to consider the District's recommendation before making a determination[.]" (Dist. Ex. 75.) Further, although C.S. signed the line on the form indicating that she "d[id] not intend to place [M.L.] in a nonpublic school for the upcoming school year[,]" she added the caveat that that condition was "[c]ontingent on an appropriate program recommendation." (*Id.*) Finally, as noted, the Parents did attend the May 1, 2020 CSE meeting and visit the District's schools. (Dist. Exs. 78–79; Hearing Tr. 481:11–482:22.) On this record, it is not entirely clear that the Parents had no intention of ever sending M.L. to a public school in the District for the 2020–21 school year, and the Court will not assume that the Parents had the worst of intentions as it relates to the District (i.e., that they were merely going through the motions so that they could get their Eagle Hill tuition reimbursed). In any event, the caselaw is clear that reimbursement may still be proper even where parents never intend to send their child to public school. *See, e.g.*, *C.L.*, 744 F.3d at 840 (explaining that parents' "pursuit of a

---

[31] Not for nothing, the Court also notes that other "courts have held uniformly that reimbursement is barred where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP." *C.S.*, 990 F.3d at 159 (alteration adopted) (quoting *M.C.*, 226 F.3d at 68).

private placement was not a basis for denying their tuition reimbursement, even assuming[] . . . that [they] never intended to keep [their child] in public school"); *see also T.K.*, 810 F.3d at 879 (rejecting the argument that parents "engaged in any form of misconduct merely by making a precautionary private school deposit prior to the meeting with public school officials during which the IEP was developed").

On balance, in the exercise of its discretion—and taking into consideration the full record, as well as the SRO's conclusion—the Court concludes that equitable considerations justify reducing the Parents' tuition reimbursement request by 50%.  *Cf. Z.A.R.*, 2022 WL 4536241, at *7 (reducing the requested tuition reimbursement by 50% based on the parents conduct in that case); *J.S.*, 279 F. Supp. 2d at 675–76 (reducing the parent's tuition reimbursement request by 75% in light of the circumstances before the court).  This reduction reflects the Parents' unilateral placement of M.L. at Eagle Hill, their significantly delayed notice to the District of their concerns, which rendered moot any potential efforts that could have addressed issues in M.L.'s IEP, and the evidence of the Parents' (at least) partial cooperativeness with the District.

### III.  Conclusion

For the reasons stated above, the District's Motion is granted in part and denied in part. Specifically, the Motion is granted to the extent that Parents are now awarded 50% of the reimbursement that they seek from the District.  Thus—given that it is undisputed that they paid $70,110.00 for M.L.'s 2020–21 tuition at Eagle Hill, (*see* Hearing Tr. 484:24–25)—the Parents are awarded $35,055.00.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 21), and close this case.

SO ORDERED.

Dated:    September 20, 2024
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge